**UNITED STATES of America**

v.

**FREZZO BROTHERS, INC., Guido Frezzo, James L. Frezzo.**

Crim. No. 78–218.

United States District Court, E. D. Pennsylvania.

July 19, 1982.

As Amended Aug. 31, 1982.

714

Peter F. Vaira, U.S. Atty., Bruce J. Chasan, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

John Rogers Carroll, Thomas Colas Carroll, Philadelphia, Pa., for defendants.

MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Defendants Guido Frezzo, James L. Frezzo, and Frezzo Brothers, Inc. (hereinafter "Frezzo Brothers") have petitioned this Court pursuant to 28 U.S.C. § 2255 to vacate and set aside their sentences pursuant to their convictions for discharging pollutants into navigable waters without a permit.[1]

The defendants were found guilty by a jury on all six counts of an indictment charging them with willfully or negligently discharging pollutants into navigable waters in violation of Sections 301(a) and 309(c) of the Federal Water Pollution Con-

---

1. The corporation, Frezzo Brothers, Inc., as distinguished from individual petitioners Guido and James Frezzo, petitioned for a writ of error coram nobis. Such petitions have generally been considered as petitions to vacate sentence pursuant to 28 U.S.C. § 2255. *See, e.g., United States v. Snead,* Cr. No. 76–502 (E.D. Pa. 1981); *Moore v. United States,* 329 F.2d 821, 822 (8th Cir. 1964), *cert. denied,* 379 U.S. 858, 85 S.Ct. 114, 13 L.Ed.2d 61 (1964); *Jenkins v. United States,* 325 F.2d 942, 945 (3d Cir. 1963), and the corporation's petition has been so considered in the history of this case. *See United States v. Frezzo Brothers, Inc.,* 642 F.2d 59 (3d Cir. 1981).

trol Act as amended in 1972 (the "Act"), 33 U.S.C. §§ 1311(a), 1319(c). Defendants subsequently filed a motion for judgment of acquittal or in the alternative for a new trial. In their motions, on which the Court heard oral argument, the defendants contended:

(A) That the Court erred in denying the defendants' pretrial motion to dismiss the indictment for failure of the Administrator of the Environmental Protection Agency (EPA) either to notify the defendants of alleged violations or to institute a civil suit against them, prior to the institution of criminal proceedings;

(B) That the Court erred in denying the defendants' pretrial motion to dismiss the indictment on the ground that there were no effluent standards applicable to defendants; and

(C) That there was insufficient evidence presented to prove that the alleged discharge of pollutants was caused either willfully or negligently by any of the defendants, that any of the defendants discharged the pollutants, that the individual defendants were either owners or corporate officers of Frezzo Brothers at the time of the alleged offenses, and that Frezzo Brothers owned the property in question or operated the holding tank in question at the time of the alleged offenses.

Finding no merit in these contentions, this Court denied the motions. The Court imposed the following sentences: thirty days imprisonment and a $25,000 fine for both Guido Frezzo and James L. Frezzo, and a $50,000 fine for Frezzo Brothers, Inc. 461 F.Supp. 266, 268 (E.D. Pa. 1978). The Court's judgment was affirmed by the Third Circuit, 602 F.2d 1123 (3d Cir. 1979). Rehearing was denied, and defendants sought certiorari, which was also denied, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). Defendants had obtained new defense counsel prior to filing the aforesaid and instant petitions. In these petitions, the defendants raised for the first time the argument that they were exempt from 33 U.S.C. § 1311(a), which makes it unlawful to discharge pollutants into navigable waters without a permit. Defendants contend that they were exempt by virtue of 40 C.F.R. § 125.4(i) (1978), which was in effect at the time the petitioners were indicted and convicted but has subsequently been revised. The government moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(6), contending that petitioners had failed to state a claim upon which relief could be granted. This Court granted the government's motion to dismiss, 491 F.Supp. 1339.

Defendants appealed the dismissal to the Third Circuit, which reversed the dismissal and remanded to this Court for further factual inquiry regarding the status of defendants' business operation and its characterization pursuant to 40 C.F.R. § 125.4(i) and for further consideration of the petitions, 642 F.2d 59 (3d Cir. 1981). For the reasons hereinafter set forth, the Court will enter an Order denying defendants' petitions for relief.

 The defendants, in order to obtain relief pursuant to 28 U.S.C. § 2255 must show that their conviction and sentence is in some way defective because it was unconstitutional, illegal, or "otherwise subject to collateral attack," 28 U.S.C. § 2255. The petitioner bears the burden of persuasion to show the infirmity of his conviction. *See Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *United States v. Bremer,* 207 F.2d 247 (9th Cir. 1953); *Walden v. United States,* 418 F.Supp. 386 (E.D. Pa. 1976). Here, the defendants claim the protection of a regulation which they allege exempted them from the statute which the jury found beyond a reasonable doubt that they violated. As parties claiming this exception, they bear the burden to demonstrate that they fall within the exception. *See United States v. Cianciulli,* 482 F.Supp. 585, 613 (E.D. Pa. 1979), *aff'd* 624 F.2d 1091 (3d Cir. 1980), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 859, 66 L.Ed.2d 802 (1981); *United States v. Rowlette,* 397 F.2d 475 (7th Cir. 1968).

 As the United States Supreme Court recently stated in *United States v. Frady,* —— U.S. ——, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982):

Once the defendant's chance to appeal has been waived or exhausted, however, we are entitled to presume he stands fairly and finally convicted, especially when, as here, he already has had a fair opportunity to present his federal claims to a federal forum. Our trial and appellate procedures are not so unreliable that we may not afford their completed operation any binding effect beyond the next in a series of endless post-conviction collateral attacks. To the contrary, a final judgment commands respect.

For this reason, we have long and consistently affirmed that a collateral challenge may not do service for an appeal.

—— U.S. at ——, 102 S.Ct. at 1592 (citations omitted). *See also, United States v. Addonizio,* 442 U.S. 178, 184, 99 S.Ct. 2235, 2239, 60 L.Ed.2d 805 (1979). In *Frady,* the Court held that a convicted defendant seeking to obtain collateral relief based on trial errors to which no contemporaneous objection was made "must show *both* (1) 'cause' excusing his double procedural default, *and* (2) 'actual prejudice' resulting from the errors of which he complains." —— U.S. at ——, 102 S.Ct. at 1593 (emphasis added). Though the instant case involves failure to raise a defense based upon a construction of a regulation rather than a failure to object to allegedly erroneous jury charges, *Frady* is instructive. *Frady* and its predecessors set forth a two-pronged standard for obtaining collateral relief. The petitioner must show a reason for his failure to raise the collateral challenge at trial and appeal *and* he must show that he was prejudiced by the procedural shortcoming (in this case, the failure to raise an alleged regulatory exemption). Defendants have met neither prong of the *Frady* test. They were represented by competent counsel and have not shown that the failure to raise the 40 C.F.R. § 125.1, *et seq.* defense amounted to ineffective assistance of counsel, *see* p. 725, *infra.* Nor have defendants shown any other good reason for their failure to raise this defense at trial or on appeal. Second, the petitioners have not shown that they were prejudiced by the failure to raise the regulatory defense because the defense is without merit, see pp. 721–725, *infra.* Therefore, the defendants have failed to meet their burden to show that their conviction and sentence should be vacated.

Defendants were tried before a jury in October 1978, for violations of the Water Pollution Act, specifically 33 U.S.C. § 1311(a) which provides:

(a) Except as in compliance with this section and sections 1312, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

33 U.S.C. § 1319(c) further provides:

Any person who willfully or negligently violates section 1311 . . . of this title . . . shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment for not more than one year, or by both.

The jury, during the Court's instructions, was read the indictment which alleged that on certain dates in 1977 and 1978, the defendants "did willfully and negligently discharge pollutants, that is, wastewaters from mushroom compost manufacturing operations, into the waters of the East Branch of the White Clay Creek, a navigable water of the United States, without having obtained a permit from the Administrator of the Environmental Protection Agency for said discharge." The Court then instructed the jury as to the elements of the crime and as to the statutory definition of "pollutant," a definition that encompasses "dredged soil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into the water." 33 U.S.C. § 1362(6).

The jury was told "If you find that a substance allegedly discharged by a defendant is any one or more of the items specified in the statute's definition of 'pollutant,' then you may find that the substance is a pollutant." The jury was also instructed as to the statutory definition of a point source,

(33 U.S.C. § 1362(14)), navigable waters (33 U.S.C. § 1362(7)), the terms "willfully" and "negligently," and the meaning of intent and specific intent under the criminal law. So informed, the jury returned a verdict of guilty, finding that the defendants had willfully or negligently discharged pollutants from a point source into navigable waters without a permit. In fact, the evidence at trial showed that defendants never applied for a permit, a fact not contested by defendants' counsel. Furthermore, counsel for the defendants never suggested at trial, in post-trial motions or argument or on the initial appeal to the Third Circuit, that the defendants were in any way exempt from the permit requirements of 33 U.S.C. § 1311(a) and 33 U.S.C. § 1342.

Section 402 of the Water Pollution Act, 33 U.S.C. § 1342, sets forth the permit system of the Act (known as the National Pollutant Discharge Elimination System or NPDES). The statute provides, in relevant part,

> The Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

33 U.S.C. § 1342(a)(1).

Section 501 of the Act, 33 U.S.C. § 1361(a) provides

> The Administrator [of the Environmental Protection Agency] is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter.

Pursuant to these grants of authority, the Administrator and the EPA promulgated regulations governing the issuance of permits allowing for some discharges of pollutants that would, in the absence of having been issued a permit, violate 33 U.S.C. § 1311(a) and exempting some discharge activities from permit requirements. These regulations, at the time of the trial of the Frezzo Brothers, were codified at 40 C.F.R. § 125.1, *et seq.* The issuance of a permit did not and does not give the permit-holder a "license to pollute." Rather, the permit is issued only after a hearing and is designed to limit the amount of pollution where, for technological reasons, some pollution is deemed unavoidable. All permits issued under the Water Pollution Act planned and provided for decreased pollution discharges in accordance with technology improvement and were designed to meet the Act's overall goal of ending discharges of pollutants into the Nation's waters by 1985. *See* 33 U.S.C. § 1251; *E.I. duPont deNemours & Co. v. Train,* 430 U.S. 112, 116–24, 97 S.Ct. 965, 969–73, 51 L.Ed.2d 204 (1977); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 696–98 (D.C. Cir. 1974).

As heretofore noted, the regulations promulgated pursuant to 33 U.S.C. § 1342 (Section 402 of the Act) exempted some pollution discharge activities from the Act's permit requirement. Specifically, 40 C.F.R. § 125.4 lists 8 areas of exclusions from the NPDES permit program. Section 125.4(i) provides that

> The following do not require an NPDES permit:
>
> (i) Water pollution from agricultural and silvicultural activities, including runoff from orchards, cultivated crops, pastures, rangelands, and forest lands, except that this exclusion shall not apply to the following:
>
> (1) Discharges from concentrated animal feeding operations as defined in § 125.51;
>
> (2) Discharges from aquatic animal production facilities;
>
> (3) Discharges from agricultural point sources as defined in § 125.53; and
>
> (4) Discharges from silvicultural point sources as defined in § 125.54.

At the time of the trial, 40 C.F.R. § 125.53 read:

> For the purpose of this section:

(1) The term "agricultural point source" means any discernible, confined and discrete conveyance from which any irrigation return flow is discharged into navigable waters.

(2) The term "irrigation return flow" means surface water, other than navigable waters, containing pollutants which result from the controlled application of water by any person to land used primarily for crops, forage growth, or nursery operations.

> COMMENT: This term includes water used for cranberry harvesting, rice crops, and other such controlled application of water to land for purposes of farm management.

(3) The term "surface water" means water that flows exclusively across the surface of the land from the point of application to the point of discharge.

It is the afore-quoted sections of the regulations upon which the petitioners based their Section 2255 motions. Petitioners contend that the mushroom composting business they conduct, which was the source of pollution discharged into a navigable stream, is an agricultural activity, in particular a non-point source agricultural activity, and that they therefore were not required by the EPA to have a permit to pollute the White Clay Creek adjoining their mushroom composting operation.[2] Therefore, reason the defendants, 33 U.S.C. § 1311(a) and 1319(c) can not apply to them, and they therefore broke no law when polluting the creek.

The defendants' position plainly applies faulty logic. Pursuant to 33 U.S.C. § 1311(a), the Congress of the United States specifically made it a crime to discharge pollutants into a navigable stream without a permit. The defendants did not

---

**2.** The regulations cited by the petitioners were promulgated by the EPA Administrator after notice of the proposed regulations and comment as provided for in Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553. *See* 38 Fed. Reg. 18,000 (1973); 41 Fed. Reg. 7963. Section 402 of the Water Pollution Control Act, 33 U.S.C. § 1342(f) authorizes the Administrator *to promulgate such regulations.* The regulations are thus "legislative" rules rather than "interpretative" rules. *See* K. Davis, *Administrative Law Treatise,* § 7:8 (1979). The Third Circuit has observed that

> a 'legislative rule is the product of an exercise of delegated legislative power to make law through rules,' whereas an 'interpretative rule is any rule an agency issues without exercising delegated legislative power to make law through rules' .... [a]n interpretative rule is a 'statement' made by an agency to give guidance to its staff and affected parties as to how the agency intends to administer a statute or regulation. In contrast, a legislative rule, rather than merely setting forth an agency's own interpretation of the meaning of a statute and, in so doing, "creates" new law affecting individual rights and obligations.

*State of New Jersey v. Department of Health and Human Services,* 670 F.2d 1262, 1280–81 (3d Cir. 1981) (citations omitted). *See also Cerro Metal Products v. Marshall,* 620 F.2d 964, 981–82 (3d Cir. 1980); *Daughters of Miriam Center for the Aged v. Mathews,* 590 F.2d 1250, 1258–59 (3d Cir. 1978). A validly promulgated legislative rule is subject to review under the "arbitrary and capricious" standard while an interpretative rule, though entitled to deference

by a reviewing court, may be overturned if the court finds the agency's interpretation of the statute to be incorrect. *Cerro Metal Products, supra,* 620 F.2d at 981–82; *Joseph v. United States Civil Service Commission,* 554 F.2d 1140, 1153–54 (D.C. Cir. 1977); *American Iron and Steel Institute v. EPA,* 526 F.2d 1027, 1047 (3d Cir. 1975).

Both the legislative and interpretative regulations issued by EPA pursuant to the Act have been the subject of much involved litigation. *See, e.g., American Iron and Steel Institute, supra; E.I. DuPont de Nemours & Co. v. Train,* 541 F.2d 1018 (4th Cir. 1976), aff'd in part, reversed in part, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). Substantial portions of regulations similar to those invoked by the petitioners were invalidated in *Natural Resources Defense Council v. Train,* 568 F.2d 1369 (D.C. Cir. 1977), in which the Court held that "the EPA Administrator does not have authority to exempt categories of point sources [agricultural or otherwise] from the permit requirements of Section 402 [of the Act.]" 568 F.2d at 1377. However, for the reasons set forth at pp. 719–725, *infra,* this Court need not decide whether the invalidity of the predecessor regulations precludes petitioners from invoking the regulations in effect during 1977 and 1978. As hereinafter set forth, the regulations, even if assumed to be valid, do not undermine defendants' convictions because they did not rely on the regulations and because the compost-making performed by the Frezzo Brothers was not an agricultural activity within the meaning of the regulations.

have a permit, and concede that they did not apply for a permit, nor did they contend at the trial that they were not required to have a permit. The jury found beyond a reasonable doubt that they willfully or negligently discharged pollutants into White Clay Creek without a permit. There was an abundance of evidence showing that the defendants violated the statute.

The petitioners contend that it is not fair under our system of criminal justice to hold them accountable for their violation of the statute on the basis of their post-trial interpretation of the above-quoted regulations. Since their conviction which was affirmed by the Third Circuit, 602 F.2d 1123 with certiorari denied by the Supreme Court, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756, their new counsel contends that § 125.1 *et seq.* of the regulations exempted them from the permit requirements of 33 U.S.C. § 1342, on the ground that they were engaged in an agricultural activity. For the reasons hereinafter set forth, the Court finds that this regulation did not exempt the defendants from the permit requirement because: (1) by their own admission, the regulations were unknown to the petitioners until nearly one year after their trial and were never relied upon by the defendants when they made their decision to pollute the creek; (2) even if the defendants had relied upon the regulations, their reliance would have been unreasonable because (a) mushroom composting in the manner conducted by the defendants is not an "agricultural activity" within the meaning of 40 C.F.R. § 125.4(i); and (b) even if the composting were an agricultural activity, the pollution discharged by the petitioners emanated from an agricultural point source as defined in 40 C.F.R. § 125.53.

█ The petitioners have never claimed that they relied on the regulations as exempting them from the statute. In fact, the evidence presented at the March hearing shows that the petitioners were not even aware of the regulations and that the regulations played no part in the Frezzo Brothers' decision to pollute the stream without a permit.

The absence of any reliance by the petitioners upon the regulations has been clear throughout the long history of this case. In denying defendants' first post-trial motions, this Court observed that the petitioners "acknowledge that they neither have a permit nor have they applied for one." 461 F.Supp. 266, 269 (E.D. Pa. 1978). This Court further noted

> Testimony was presented by several witnesses that on many occasions, commencing as far back as 1970, the defendants in this case had been investigated, visited and confronted by a number of state and county employees concerning the fact that the stream in question was being polluted by runoff from the compost operation conducted by the defendants on the Frezzo property.

461 F.Supp. at 270. In rendering decision on petitioners' Section 2255 petitions, this Court determined that

> review of the entire record in this case, however, reveals that the petitioners have never attempted to establish that they relied on these regulations in deciding not to apply for a permit. In fact, these regulations were never mentioned in the record until the petitioners filed a motion for a rehearing in the court of appeals after their original appeal had been decided adversely to them. Since the petitioners have not shown that they ever relied on these regulations, they cannot claim that the regulations would have led them to believe that their business activities were exempt from the permit requirements of the Act.

Memorandum of June 27, 1980 at 7, 491 F.Supp. at 1343, citing *United States v. United States Steel Corp.,* 482 F.2d 439 (7th Cir. 1973), *cert. denied,* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147; *United States v. Pennsylvania Industrial Chemical Corporation,* 411 U.S. 655, 670, 93 S.Ct. 1804, 1814, 36 L.Ed.2d 567 (1973).

The evidence presented at the March, 1982 hearing makes it unmistakably clear that none of the petitioners knew of or relied upon these regulations in making their decision to discharge pollutants into

the stream. Stipulated fact No. 25 of the pretrial order for the Section 2255 hearing states that the defendants had no knowledge of the regulations at issue prior to July 13, 1979 and that the petitioners were first apprised of the regulations after they obtained new counsel. This occurred after July 13, 1979, and well after the defendants were tried and convicted by a jury and after this Court had denied their post-trial motions and had been affirmed in that denial by the Third Circuit.

Thus, the record has, at every juncture in this protracted litigation, clearly shown that the petitioners were never led by any regulation or statute to believe that the conduct for which they were convicted was not a crime. On the contrary, regulatory agencies during the 1970s suggested to the Frezzo Brothers that the government considered their conduct to be unlawful. In actuality, all the evidence shows that the defendants knew or should have known that the compost-producing practices were not shielded from the nation's anti-pollution laws.

Furthermore, the petitioners admit that they did not rely on the regulations in deciding not to apply for a permit. Under these circumstances, the petitioners cannot claim unfair surprise in their trial and conviction. The petitioners did not rely on a regulation thinking that it approved their conduct. Rather, the petitioners knowingly engaged in conduct that violated federal statutes, either because they were oblivious to the law or because they disregarded the law—not because they relied on a portion of the law. The failure of the petitioners to raise the issue as to their reliance on the regulations at the trial or on appeal underscores the fact that they did not rely on the regulations as insulating them from the clear meaning of the statute.

■ Furthermore, the statute under which the petitioners were convicted, 33 U.S.C. § 1311, is not the type of criminal statute which requires the government to prove that the defendants specifically intended to violate the statute. To sustain a conviction under Section 1311, it is necessary only that the defendants acted willfully or negligently and that they intended to do the acts for which they were convicted. In order to convict, it is not necessary that the defendants intended to violate the law. Thus, so long as the petitioners dumped pollutants into a navigable stream without a permit, their view as to the legality of their actions is irrelevant. The Supreme Court of the United States has repeatedly stated that

The power of the legislature to declare an offense, and to exclude the elements of knowledge and due diligence from any inquiry as to its commission, cannot, we think, be questioned.

*Chicago, Burlington, & Quincy R. Co. v. United States,* 220 U.S. 559, 578, 31 S.Ct. 612, 617, 53 L.Ed.2d 582 (1910), citations omitted.

The Federal Water Pollution Control Act makes the petitioners' conduct malum prohibitum. It is, like the nation's pure food and drug laws,

[A] now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good, it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger.

*United States v. Dotterweich,* 320 U.S. 277, 280–81, 64 S.Ct. 134, 136–37, 88 L.Ed. 48, *reh. denied,* 320 U.S. 815, 64 S.Ct. 367, 88 L.Ed. 492 (1943). *See also Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957), *reh. denied,* 355 U.S. 937, 78 S.Ct. 410, 2 L.Ed.2d 419 (1958) ("conduct alone without regard to the intent of the doer is often sufficient to convict defendant for violating malum prohibitum regulatory statute. There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition."); *United States v. Balint,* 258 U.S. 250, 252, 42 S.Ct. 301, 242, 66 L.Ed. 604 (1922) (criminal statutes need not recognize defenses founded on

"good faith or ignorance."); *Shevlin-Carpenter Company v. Minnesota,* 218 U.S. 57, 68–69, 30 S.Ct. 663, 666, 54 L.Ed. 930 (1909) (absence of specific intent as requisite element for conviction of crime does not offend due process; "innocence cannot be asserted of an action which violates existing law, and ignorance of the law will not excuse.").

Certainly, a criminal statute "must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation." *Boyce Motor Lines v. United States,* 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952). Section 1311 of the Act meets this standard. In clear language, the statute informs all that pollution into navigable waters is forbidden unless the polluter has obtained a permit from the government. By its terms, the statute does not require that a defendant intend a criminal act in order to be convicted of a statutory violation. The Act requires only that the defendant have willfully or negligently committed the acts in question. Thus, the plain language of 33 U.S.C. § 1311, indicates that it is the type of regulatory statute heretofore discussed. Case law interpreting the Act accords with that interpretation. *See United States v. Phelps Dodge Corp.,* 391 F.Supp. 1181, 1187–88 (D. Ariz. 1975).

■ However, the petitioners' convictions would remain valid even if they had relied upon the regulations. The language of the regulations and the evidence presented at the March, 1982 hearing makes it abundantly clear that the Frezzo Brothers mushroom composting operation is clearly not an "agricultural activity" within the meaning of 40 C.F.R. § 125.4(i). Pursuant to the Third Circuit's remand of this case, 642 F.2d at 63, this Court held a hearing to determine the nature of the composting activities conducted by the defendants. The hearing took place on March 3, 4, 5, 11, and 12, 1982. Based on the evidence presented at that hearing and evidence presented at trial or otherwise in the record of this case, the Court finds the following facts.

Frezzo Brothers, Inc. is a Pennsylvania corporation engaged in the creation and sale of mushroom compost and the growing of mushrooms near Avondale, Pennsylvania. The business is operated by Guido and James Frezzo serving as the principal corporate officers. The compost made by the defendants provides a growing medium for mushrooms. Defendants employ paid labor in both the growing of mushrooms and in the preparation of compost; different laborers are employed in these different functions. The Frezzo Brothers, Inc. fiscal year encompassing the acts of pollution discharge for which defendants were convicted began July 1, 1977 and ended June 30, 1978. During that period, Frezzo Brothers, Inc. had total income of more than 4.35 million dollars and a gross profit of more than 1.5 million dollars. During that year, approximately 90 percent of the defendants' compost production was sold to other mushroom growers. More than 90 percent of the corporation's gross income for that fiscal year was derived from the sale of compost, which the corporation produces in response to orders received from numerous mushroom growers.

Compost is produced by combining several raw ingredients, principally horse manure, but also including straw, corn cobs, cocoa shells, poultry manure and gypsum, mixing these ingredients with water, and then allowing them to ferment outside on concrete slabs known as "wharves." The Frezzo Brothers operation at the times in the indictment contained five acres of concrete wharf area and has since been expanded. All compost produced by the defendants is made with raw ingredients purchased from outside suppliers. At Frezzo Brothers, the aforementioned ingredients are combined on the concrete wharves in piles 6–8 feet high which measure up to 60 yards long. The piles may be wetted by rain, but are regularly watered by the de-

fendants whenever rainfall is insufficient to wet the pile so as to maximize the fermenting process. The exact mixture of ingredients varies according to their availability and cost. These piles are frequently aerated by being mechanically turned as well as artificially wetted. The turning and wetting is essential to compost production and takes place every two-three days for between 10 and 15 days. These piles during this time generate their own biomass heat and this triggers a nitrogen conversion reaction which increases the nutritive content of the mixture and produces compost upon which mushrooms can be grown. The finished product of compost ranges in water content from 65 percent to 75 percent. The compost is then transferred to concrete huts or mushroom growing houses where it undergoes a pasteurization process to relieve it of microflora, and insects, worms, and ammonia that could impede mushroom growth. Each hut contains approximately 180 cubic yards of compost.

Pasteurized compost is then combined with mushroom spawn that eventually produces mushrooms. Each house contains about 8,000 cubic feet of space and has a slanted floor so that compost may be "slid" into the house through the upper door. The mushrooms grow in these dark houses.

The Frezzo Brothers wharf at the time of trial measured 5 acres in size. At that time, the facility also had a 114,000 gallon concrete holding tank designed to contain water run-off from the compost wharves and to recycle water back to them. The facility has also had a separate storm water run-off system that carried rain water through a pipe to a channel box located on an adjoining property owned by another mushroom grower. This channel box was connected by a pipe with an unnamed tributary of the East Branch of the White Clay Creek. The waters of the tributary flowed directly into the creek, which ultimately runs into the Delaware River. On each of the six dates charged in the indictment, run-off from the compost systems made its

way into the storm water run-off system and was permitted to be discharged into the creek. Samples of the runoff at these times contained pollutants that may not be discharged under the Act without a permit, which defendants lacked.

At the hearing on the Section 2255 petitions, defendants produced two expert witnesses in support of their contention that the making of mushroom compost is an agricultural activity, Drs. Paul Wuest and Leon Kneebone, both members of the faculty of Penn State University. The Government presented the testimony of Charles Rehm of the Pennsylvania Department of Environmental Resources, Richard Casson of the Environmental Protection Agency, Mark Stevens, an engineer, Dr. Harry Motto, a member of the Rutgers faculty, and Milo Peterson, an industrial classification expert employed by the federal government. Predictably, witnesses Wuest and Kneebone opined and gave testimony which suggested that compost-making is agricultural while witnesses Rehm, Casson, Stevens, Motto and Peterson opined and gave testimony which suggested that the process resembles manufacturing more than agriculture.

The facts and insights given by these men on the stand were most helpful to the trier of fact but the final analysis of whether mushroom composting falls within the "agricultural activity" exclusion of 40 C.F.R. § 125.4(i) is ultimately a question of law which the Court must decide. Therefore, the Court has considered the facts and opinions elicited from each of these witnesses, but has not deferred to the viewpoint of any single witness as being determinative of the ultimate issue at the hearing. The Court has also examined the studied opinions of Judges Edward Becker and Louis Pollak in the cases of *Kaolin Mushroom Farms, Inc. v. United States,* 79–2 CCH Tax Cases (CCH) ¶ 9652, No. 77–4379 (E.D. Pa. 1979) and *Marshall v. Frezzo Brothers, Inc.,* No. 79–196 (E.D. Pa. June 12, 1981), *aff'd sub nom. Donovan v. Frezzo Brothers, Inc.,*

678 F.2d 1166 (1982), respectively. Upon consideration of all this material, the Court finds that mushroom compost production as engaged in by Frezzo Brothers, Inc. at the times relevant to the indictment and conviction was not an "agricultural activity" within the meaning of 40 C.F.R. § 125.4(i).

The composting process at the Frezzo Brothers plant, examined as a whole, is remarkably similar to manufacturing. Raw materials are brought to the Frezzo facility from outside sources. For example, Frezzo Brothers purchases horse manure from farms located over a wide area. The ingredients are combined and placed on a concrete wharf. The ingredients are not merely lumped together on the wharf but are arranged in a regulated fashion into 6–8 feet high and 60-yard long piles. The piles are then mechanically turned and aerated at more or less regular intervals. Water is added to the piles in a controlled fashion so that the piles receive a regulated amount of moisture. The resulting compost is further processed through pasteurization and 90 percent of the product is then sold to other mushroom growers. Only 10 percent of the compost is used by Frezzo Brothers in their own mushroom houses. The compost so produced must be further processed by pasteurization before it is used as a growing medium for mushrooms. The Court finds that the mere fact that mushrooms are grown in or on the compost is not sufficient reason to label the process of compost-making on the scale conducted by the Frezzo Brothers "agriculture."

In examining the Frezzo Brothers operation to determine whether it met the "farm labor" exception to the wage and hours provision of the Fair Labor Standards Act, 29 U.S.C. § 203(f), 213, the Third Circuit, 678 F.2d 1166, affirming Judge Pollak's conclusion that the compost-operation of Frezzo Brothers (the very operation at issue in this case) was not "agriculture" within the meaning of the Act, said:

[A]lthough mushroom growing is a type of farming, the production of mush-

room compost is a preliminary activity which manufactures a product that is then used in farming . . .

. . . . .

[P]reparation of mushroom compost does not constitute the cultivation and tillage of the soil.

. . . . .

[A]s both parties agree, none of the ingredients of mushroom compost, which include manure, cocoa shells and hay, could accurately be termed soil. The end product, although in a very different form than the raw ingredients, is still not within the standard definition of soil. *See Black's Law Dictionary* 1563 (1968), *Webster's New Collegiate Dictionary,* 1105 (1976) . . . [w]here Congress leaves a statutory term undefined, that term should be given its ordinary and common sense meaning.

*Donovan v. Frezzo Brothers, supra,* at 1169–1170. The Court recognizes that in *Donovan* the issue was whether the composting operation of the Frezzo Brothers was agriculture within the definition set forth in Section 203(f) of the Fair Labor Standards Act. However, the analysis of the Third Circuit conforms to substantiate the analysis which this Court has made in determining that the Frezzo Brothers operation is not agriculture, but is a manufacturing type of operation.

This Court's determination accords with the conclusion of the Third Circuit in *Donovan v. Frezzo Brothers,* wherein the Court stated:

We think that mushroom compost is more appropriately described as a commodity produced by an industrial process or technique rather than as an agricultural commodity. Mushroom composting involves the use of heat and moisture to biologically, physically and chemically alter the ingredients into a changed product—compost. Neither mushroom compost nor its ingredients, as we have seen, constitutes soil or a product of the soil.

We find that the composting process is more akin to manufacturing than agriculture.

678 F.2d at 1171, *quoting Mitchell v. Budd,* 350 U.S. 473, 482, 76 S.Ct. 527, 532, 100 L.Ed. 565 (1955).

Like the Third Circuit and Judge Pollak, this Court attached significance to the fact that the Frezzo brothers sell 90 percent of the compost which they produce to mushroom farmers. Consequently, the Frezzo brothers are not operating a typical farm where the farmer "tills," "nurtures," and "cultivates" and "enriches" the soil on which he grows his crops. The defendants have contended that the involved composting process resembles soil tillage and that compost resembles soil in that it is the growing medium of mushrooms. Even if this reasoning were persuasive, it would not make Frezzo Brothers an agricultural activity. A typical farmer does not cultivate soil and then sell 90 percent of it to other "farmers." The Court finds, therefore, that the Frezzo Brothers, in connection with their production of compost, are engaging in a manufacturing activity and not an agricultural operation.

The government urges this Court to adopt and employ the definitions of the Standard Industrial Classification Manual published by the U.S. Office of Management and Budget. However, the Court need not go this far. Rather, the Court has attempted to construe the term "agricultural activity" within the meaning of the regulation here at issue. Common understandings of the terms involved, when applied to this case, lead inexorably to the conclusion that the composting which takes place at Frezzo Brothers is not an agricultural activity for purposes of the regulations and the Water Pollution Control Act.

■ This Court has determined that the composting operation of the Frezzo Brothers is manufacturing, not agriculture. However, even if this Court were to agree with the petitioners that the composting

conducted by the Frezzo Brothers was agricultural activity, we would then be required to conclude that a permit would be necessary because that pollution caused by the Frezzo Brothers emanated from an "agricultural point source" within the meaning of 40 C.F.R. §§ 125.53 and 125.4(i)(3). By its terms, section 125.4(i)(3) denies its exception to the permit requirement to "agricultural point sources" and Section 125.53 defines such sources as being "any discernible, confined and discrete conveyance from which any irrigation return flow is discharged. into navigable waters." Section 125.53(a)(2) further defines irrigation return flow as "surface water, other than navigable waters, containing pollutants which result from the controlled application of water by any person to land used primarily for crops, forage growth, or nursery operations."

As heretofore noted, the composting operation at Frezzo Brothers uses water, in controlled application, to achieve the proper mixture for creating compost. Thus, in the event that this Court had adopted the defendant's analogy that the Frezzo Brothers operation was agricultural, such a determination would compel the conclusion that the water used for making the compost is irrigation within the meaning of the regulations, and that the water accumulated in the catch basin is "irrigation return flow," the surplus of which the Frezzo Brothers discharged through a pipe (a point source) into the stream, thereby polluting the stream. Thus, the polluted water was irrigation return flow within the meaning of 40 C.F.R. § 125.53(a)(2).

Without doubt, the sewer system of the Frezzo Brothers is a "discernible, confined and discrete conveyance" discharging the irrigation return flow. Appendix A of this memorandum, a photograph of a pipe from which Frezzo Brothers discharge enters the creek, illustrates the concentrated nature of the source of the pollution that defendants discharged into White Clay Creek. One glance at the photograph reveals that the

source of the pollution at issue in this case is not run-off in any way similar to rain water running downhill from croplands.

Furthermore, the regulations, read as a whole, clearly do not exempt from the act the concentrated and organized discharges of the type found at the Frezzo Brothers facility. The regulations sought to exempt from 33 U.S.C. § 1311 unconcentrated agricultural pollution such as rain water run-off containing fertilizer. However, during the course of the trial in this case, it became apparent that the pollution discharged by the Frezzo brothers was nothing like rain water run-off but was like sewage.

■ In light of this Court's determination that the "agricultural activity" exclusion does not apply to petitioners, it cannot be said that they were ineffectively represented at trial by their former counsel who did not argue that the defendants were in any way exempt from the permit requirements of 33 U.S.C. § 1342. In order to establish a claim of ineffective assistance of counsel, the defendants must show that the performance of counsel fell below that "customary skill and knowledge which normally prevails" in this area and that they were prejudiced as a result of trial counsel's failure to raise the agricultural exclusion issue. See United States v. Swinehart, 617 F.2d 336, 340–41 (3d Cir. 1980); United States v. Greene, 510 F.Supp. 128, 131 (E.D. Pa. 1981); United States v. Snead, Cr. No. 76–502 (E.D. Pa. 1981). Petitioners have satisfied neither prong of this test.

Defendants also contend that they will be prejudiced if this Court finds that compost making is not an agricultural activity on the ground that this case was tried to the jury on the theory that the Frezzo Brothers operation produces agricultural waste. This Court has reviewed the trial transcript and its instructions to the jury and has determined that defendants' contention is incorrect. The jury was charged that, in order to convict, they must find that: (1) the defendants discharged a pollutant; (2) the defendants' discharge of the pollutant was done willfully or negligently; (3) the defendants did not have a permit to discharge the pollutant. The Court instructed the jury as to the definition of "pollutant" found at 33 U.S.C. § 1362(6). This definition encompasses both agricultural and nonagricultural waste. Neither this Court nor the jury made any finding that the pollutants discharged by the defendants were specifically agricultural waste or any specific type of waste. The jury found only that the discharges of the defendants came within the statutory definition of pollutant.

Furthermore, any objection to either the jury instructions or the prosecution's closing argument should have been raised by the defendants at trial. This contention of the defendants falls clearly within the rule of United States v. Frady, —— U.S. ——, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) as it, like Frady, involves collateral attack upon the jury instructions and closing arguments. Therefore, the petitioners must show both cause for their failure to object to the charge to the jury or any prosecutorial characterization of their activities and prejudice resulting from the actions of the prosecutor or the Court. Again, petitioners have met neither prong of the Frady test.

While this Court has not discussed herein all of the contentions which were raised by defendants in their Section 2255 petitions, it has, however, reviewed the entire record and considered all the grounds alleged by the defendants in their petitions and finds that none of them either singly or collectively has sufficient substance to merit any further discussion as a basis for granting relief from their convictions or for vacating or setting aside their sentences. An appropriate order will be accordingly entered.

Appendix A