[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 7, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-11932
_____

D. C. Docket No. 89-08517-CV-NCR

FISHERMEN AGAINST THE DESTRUCTION
OF THE ENVIRONMENT, INC.,

Plaintiff-Appellant,

versus

CLOSTER FARMS, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 7, 2002)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and VINSON[*], Chief District Judge.

KRAVITCH, Circuit Judge:

_____

[*]Honorable C. Roger Vinson, Chief U.S. District Judge for the Northern District of Florida, sitting by designation.

This case presents the question whether the Clean Water Act requires a permit for a farm to discharge water from its water management system into an adjacent lake. Because the evidence fails to show any pollutants discharged into the lake other than those that fall within the agricultural exemptions to the Clean Water Act, we find that no permit is required.

## I. BACKGROUND

Closter Farms, Inc. ("Closter Farms") is a farming operation that grows sugar cane on land adjacent to Lake Okeechobee. The land is leased from the State of Florida. As a requirement of the lease, Closter Farms is responsible for the operation of a water management system that provides drainage for its agricultural lands as well as for the following adjacent properties: (1) the Palm Beach/Glades Airport, (2) the Pahokee Wastewater Treatment Plant, (3) a Palm Beach County park, (4) vacant land previously occupied by a tractor retail sales operation, and (5) State Road 715. The drainage system is necessary for the continued use of these lands because, prior to the construction of the water management system and the dikes that divide it from Lake Okeechobee, the lands were submerged under the lake for parts of the year. The water drainage system takes excess water from the irrigation canals that run through Closter Farms and pumps it into Lake

2

Okeechobee.

Fishermen Against Destruction of the Environment ("FADE"), an environmental organization, brought this Clean Water Act ("CWA") citizen suit alleging that Closter Farms is violating the Act by discharging pollutants into Lake Okeechobee without a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1311(a). The CWA requires any party that discharges pollutants from a "point source" into navigable waters to have an NPDES permit, unless the discharges fall into an exception. 33 U.S.C. §§ 1311, 1342. A "point source of pollution is one which enters navigable waters from a discrete, defined source." 33 U.S.C. § 1362(14). At the partial summary judgment stage, the district court determined that Culvert 12A, from which excess water is pumped into Lake Okeechobee, was a "point source," and therefore any pollutants discharged into Lake Okeechobee must either be permitted or fall into an exception.

A nonjury trial was subsequently held to determine whether non-exempt pollutants were being pumped into the lake. At trial, Closter Farms argued that, although they have never had an NPDES permit, one was not required because the adjacent properties that share the water management system all either have NPDES permits or are exempted from NPDES permitting requirements, and any water

3

discharged from Closter Farms itself was exempted due to agricultural exemptions contained in the CWA.  See 33 U.S.C. § 1362(14). The district court found that Closter Farms was discharging pollutants into Lake Okeechobee through Culvert 12A, but that FADE "failed to establish the addition of a pollutant which would not be exempt."  The court therefore entered judgment for Closter Farms.  FADE appeals from that judgment.

## II.  DISCUSSION

The district court's interpretation of the Clean Water Act is an issue of law that this court reviews de novo.  See Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1529 (11th Cir. 1996).   We review the district court's findings of fact for clear error.  See Whitley v. United States, 170 F.3d 1061, 1068 (11th Cir. 1999).  "We may affirm the district court on any adequate ground, even if it is other than the one on which the court actually relied."  Parks v. City of Warner Robins, 43 F.3d 609, 613 (11th Cir. 1995).

The district court found that "[a]lthough Closter Farms is polluting Lake Okeechobee, it has complied with the established legislative scheme."  Although the district court failed to make explicit findings as to the source of the pollutants, implicit in the decision are two conclusions:  (1) any  pollutants that originated on

4

Closter Farms fall within the agricultural exemptions to the CWA, and (2) any pollutants that originated elsewhere were allowed by an NPDES permit or an exemption to the permitting requirements. We will address each conclusion in turn.

The CWA specifically exempts "agricultural stormwater discharges and return flows from irrigation agriculture" from the definition of a point source. See 33 U.S.C. § 1362(14). Because these water discharges are not considered to be point sources, there is no requirement that a property owner discharging these waters have an NPDES permit. See 33 U.S.C. §§ 1311, 1342. FADE contends that the discharged water is neither "stormwater discharge" nor "return flows from irrigation agriculture,"[1] and therefore Closter Farms has been illegally discharging pollutants without a permit.

Evidence established that the sources of the water being pumped into Lake Okeechobee are: (1) rainfall, (2) groundwater withdrawn into the canals from the

---

[1] FADE also argues that, because the water management system stores rainwater and allows pollutants to settle before it pumps it into Lake Okeechobee, it is not "agricultural" and therefore does not qualify under the agricultural exemption. FADE cites United States v. Frezzo Bros., Inc., 546 F.Supp. 713 (E.D. Pa. 1982) for the proposition that the agricultural exception should only apply to water being used exclusively for farming. Frezzo Brothers, however, is inapplicable. In that case, mushroom farmers were using part of their farm to produce compost primarily to sell to others, and the district court found that the agriculture exception did not apply to that aspect of the business. See id. at 722-23. By contrast, Closter Farms's only purpose in operating the water management system is to allow it to grow sugar cane.

areas being drained, and (3) seepage from the lake. The determination that the discharged rainwater is "agricultural stormwater discharge" is a reasonable one. See Concerned Area Residents for the Env't v. Southview Farm, 34 F.3d 114, 121 (2d Cir. 1994) (holding that "agricultural stormwater discharge" exemption applies to any "discharges [that] were the result of precipitation."). The fact that the stormwater is pumped into Lake Okeechobee rather than flowing naturally into the lake does not remove it from the exemption. Nothing in the language of the statute indicates that stormwater can only be discharged where it naturally would flow. See 33 U.S.C. § 1362(14). There also does not appear to be any case law supporting FADE's position.

We also conclude that the discharged groundwater and seepage can be characterized as "return flow from irrigation agriculture." The canals are used to irrigate Closter Farms' sugar cane farm through the process of "flood irrigation," in which water is forced into the sugar cane fields by raising the water levels in the canals. All of the water that has seeped into the canals from Lake Okeechobee, either above or below ground, has been used in the irrigation process and therefore discharging it back into the lake is a "return flow." Flood irrigation is exempted from permitting requirements in the same manner as traditional irrigation. See S. Rep. No. 95-370 (1977) reprinted in 1977 U.S.C.C.A.N. 4326, 4360. We therefore

6

agree with the district court that any pollutants that originated within Closter Farms can be discharged into Lake Okeechobee by Closter Farms without an NPDES permit.

Any pollutants that originated in the non-agricultural properties adjacent to Closter Farms obviously do not fall within the agricultural exemptions. The district court found that Closter Farms "established that discharges from [the adjoining properties] are either the subject of existing NPDES permits or are exempted from NPDES permitting." We affirm, because we conclude that there is insufficient evidence in the record that Closter Farms discharged any non-agricultural pollutants into Lake Okeechobee. The sole evidence at trial that any pollutants come from properties other than Closter Farms was provided by the testimony of Herb Zebuth, the environmental manager from the Florida Department of Environmental Protection. Mr. Zebuth did not identify any studies or research to confirm the sources of pollutants. The testimony was that the waste treatment plant "initially" was a source of the pollution, but failed to explain whether the plant continued as a source of pollution after it switched to deep well injections and discontinued discharging into Closter Farms's canals. Mr. Zebuth also came to the tentative conclusions that there was "certainly probably some impact from run off from the 715 county road," and "[t]here was some question, I

7

think, about the contribution that the county park might have through septic tanks that are used."[2]  We find no error in the district court's determination that there were no non-exempt pollutants discharged into Lake Okeechobee originating from properties adjacent to Closter Farms because we conclude there is insufficient evidence that there were any such pollutants at all.

## III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[2] Zebuth testified as follows:

Q: Can you tell the Court what were the sources that were identified of these pollutants [being discharged into Lake Okeechobee]?
A: In the beginning when we first began there were discharges from the Pahokee city sewage treatment plant into Closter Farms discharges.  And that was one source.
　　There was fertilization of the fields that occurred.  That was another source.
　　There was spraying of herbicides to control weeds within the fields and within the canal system.  And that was another source.
　　There was certainly probably some impact from run off from the 715 county road that runs through the property.
　　And certainly under prolonged pumping conditions there was the drawing of old sea water that was trapped within the limestone under the property when Florida emerged from the ocean.
　　And heavy pumping would draw out that old sea water from under the ground.  And that would contribute constituents that exceeded standards when they were pumped from the ground.
　　There was some question, I think, about the contribution that the county park might have through septic tanks that are used.
　　That is all I can remember at this time.