**INLAND STEEL COMPANY, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 77–1648.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 15, 1978.
Decided March 3, 1978.

James W. Gladden, Chicago, Ill., for petitioner.

Pamela P. Quinn, Alan W. Eckert, Water Quality Div., Environmental Protection Agency, Washington, D. C., Thomas P. Sullivan, U. S. Atty., Alexander Polikoff, Chicago, Ill., James W. Moorman, Dept. of Justice, Washington, D. C., for respondent.

Before SWYGERT and TONE, Circuit Judges, and SHARP, District Judge.*

TONE, Circuit Judge.

This is a petition for review of an order of the Environmental Protection Agency granting a permit under § 402 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1342,[1] allowing Inland Steel Company to discharge certain pollutants in waste water from its Indiana Harbor Works in East Chicago, Indiana. The question raised is whether EPA may properly include in the permit a condition that the permit will be modified to reflect subsequently adopted toxic pollutant standards under § 307(a) of the Act that are more stringent than the standards contained in the permit as issued. Inland contends that such a condition is beyond EPA's power to impose and, in fact, is specifically prohibited by § 402(k) of the Act. We disagree and therefore uphold this condition of the permit.

The Indiana Harbor Works is an integrated steel manufacturing facility that uses Lake Michigan water in its production processes and, after treatment, discharges the water into the Indiana Harbor Canal. Inland applied for a National Pollutant Discharge Elimination System (NPDES) permit for the plan under § 402 of the Act. The initial permit was issued in 1974, and an amended permit was issued on July 23, 1976 for a period of three years. The following provision appears in Inland's permit:

[I]f a toxic effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is established under Section 307(a) of the Act for a toxic pollutant which is present in the discharge and such standard or prohibition is more stringent than any limitation for such pollutant in this permit, this permit shall be revised or modified in accordance with the toxic effluent standard or prohibition and the permittee so notified.

This requirement was included in the permit in accordance with the following NPDES regulation promulgated by EPA pursuant to the authority granted it under the Act:

(a) Regional Administrators shall insure that the terms and conditions of all issued permits provide for and insure the following:

\*　　\*　　\*　　\*　　\*　　\*

(6) That if a toxic effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is established under section 307(a) of the Act for a toxic pollutant which is present in the permittee's discharge and such standard or prohibition is more stringent than any limitation upon such pollutant in the permit, the Regional Administrators shall revise or modify the permit in accordance with the toxic effluent standard or prohibition and so notify the permittee.

40 C.F.R. § 125.22(a)(6).

After receiving its permit, Inland requested and was granted an adjudicatory

---

\* The Honorable Allen Sharp, United States District Judge of the Northern District of Indiana, is sitting by designation.

1. Sections of the Act, 33 U.S.C. § 1251, *et seq.*, are referred to in this opinion by their designations in the Statutes at Large. The parallel United States Code citations for the sections to which most frequent reference is made are as follows:

Section 301—33 U.S.C. § 1311,
Section 304—33 U.S.C. § 1314,
Section 306—33 U.S.C. § 1316,
Section 307—33 U.S.C. § 1317,
Section 402—33 U.S.C. § 1342.

hearing under the authority of 40 C.F.R. § 125.36(b). In the ensuing administrative proceeding, Inland challenged the modification provision set forth above, although there were, and are as yet, no toxic pollutant standards applicable to the Indiana Harbor Works.[2] The Administrator upheld the toxic pollutant provision in Inland's NPDES permit, and this petition for review followed.[3]

Although Inland frames its attack as one upon the toxic pollutant provision of the permit, it necessarily challenges the validity of the regulation upon which the provision is based, which, as we have noted, requires that an EPA Regional Administrator issuing a permit include in that permit a condition to the effect that any subsequently promulgated more stringent toxic pollutant effluent standard will be incorporated into the permit. We therefore must decide, with the question of the Administrator's authority to impose the modification condition in the permit, the underlying question of his authority to promulgate the regulation.

The pertinent provisions of the Act are set forth and discussed in *E. I. duPont de Nemours & Co. v. Train,* 430 U.S. 112, 116–121, 97 S.Ct. 965, 50 L.Ed.2d 204 (1977), *United States Steel Corp. v. Train,* 556 F.2d 822, 829–831 (7th Cir. 1977), and *American Meat Institute v. EPA,* 526 F.2d 442, 444–446, 448–452 (7th Cir. 1975). We proceed on the assumption that the reader has a general understanding of the scheme of the Act.

The issuance of NPDES permits, such as the one issued to Inland, is governed by § 402 of the Act. Paragraph (a)(1) of that section provides that the Administrator of EPA may

issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding § 301(a) [making the discharge of any pollutant by any person unlawful except in compliance with specified sections of the Act], upon condition that such discharge will meet either all applicable requirements under §§ 301, 302, 306, 307, 308, and 403 of this Act, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this Act.

Paragraph (a)(2) directs the Administrator to "prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection . . . ." Permits "are for fixed terms not exceeding five years." Section 402(b)(1)(B).[4]

Section 402(k), upon which Inland Steel bases its principal argument, states as follows:

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 309 and 505, with sections 301, 302, 306, 307, and 403, except any standard imposed under section 307 for a toxic pollutant injurious to human health. Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 301, 306, or 402 of this Act, or (2) section 13 of the Act of March 3, 1899, unless the Administrator

---

**2.** Toxic pollutant standards have been adopted, see the Clean Water Act of 1977, Public Law 95–217, § 53(a), amending § 307(a)(1) of the FWPCA, but apparently none of them applies to the Indiana Harbor Works.

**3.** Business and Professional People for the Public Interest participated in the proceeding before the Administrator and has been conditionally granted leave to intervene before us. Inland now appears to acquiesce in the intervention, inasmuch as the positions of that organization and the Administrator in this court are the same.

**4.** Paragraph (a) of § 402 provides for permits to be issued by the Administrator. Paragraph (b) permits the Administrator to delegate the permit issuing authority to a state, if the state program meets certain requirements. The permit program of the Administrator under paragraph (a)(1) is "subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section."

or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. For the 180-day period beginning on the date of enactment of the Federal Water Pollution Control Act Amendments of 1972, in the case of any point source discharging any pollutant or combination of pollutants immediately prior to such date of enactment which source is not subject to section 13 of the Act of March 3, 1899, the discharge by such source shall not be a violation of this Act if such a source applies for a permit for discharge pursuant to this section within such 180-day period.

Sections 309 and 505, referred to in the first sentence, are enforcement provisions. The former authorizes the Administrator to issue compliance orders, bring suits, and seek penalties to enforce the Act, including permit conditions and requirements. Section 505 authorizes citizens to bring actions against the Administrator for not performing nondiscretionary duties and also against dischargers for violations of the Act.[5]

Inland argues that the first sentence of § 402(k) makes the terms of the permit irrevocable during the life of the permit, except with respect to a standard imposed for a toxic pollutant injurious to human health. Our reading of that sentence in the context of the rest of the Act and of the legislative history leads us to reject that argument.

To begin with, § 402(k) does not purport to address the question of permit modification. Its concern is what constitutes compliance with the Act for the purpose of an enforcement proceeding brought under § 309 or § 505. It allows the permit holder

an absolute defense if he can demonstrate compliance with his permit, unless the standard sought to be enforced is a toxic pollutant standard relating to human health. The obvious reason for the exception is that protection of human health should not be delayed while proceedings are undertaken to modify the permits of those dischargers who are discharging that pollutant.

The legislative history confirms this reading. Referring to the paragraph that ultimately became § 402(k), the House Report on the bill states as follows:

> The purpose of the provision is to assure that the mere promulgation of any effluent limitation or other limitation, a standard, or a thermal discharge regulation, by itself will not subject a person holding a valid permit to prosecution. However, once such a requirement is actually made a condition of the permit, then the permittee will be held to comply with the terms thereof.

H.R.Rep. on H.R. 11896, contained in "A Legislative History of the Water Pollution Control Act Amendments of 1972" 815 (hereinafter cited legislative history). There is nothing in the legislative history to indicate that § 402(k) was intended to prohibit modification of a permit to bring it into conformity with a different or more stringent standard.

The enforcement focus of § 402(k) appears not only from the first sentence but from the balance of the paragraph. The second sentence protects applicants for permits under the Refuse Act[6] from FWPCA enforcement until the end of 1974. The third sentence protects applicants who were previously unregulated from enforcement for the first six months after the adoption of FWPCA. The entire function of para-

---

**5.** Briefly, the other sections referred to in § 402(k) provide as follows: § 301 requires compliance with effluent limitations issued by the Administrator based on best practicable technology by July 1977 and with effluent limitations based on best available technology by July 1983. Section 302 allows the Administrator to impose more stringent standards than the 1983 effluent limitations on particular dischargers if water quality considerations re-

quire. Section 306 provides for the development of performance standards for new plants. Section 307 pertains to toxic pollutant and pretreatment standards. Section 403 relates to ocean discharges.

**6.** 33 U.S.C. § 407. See *United States Steel Corp. v. Train*, 556 F.2d 822, 831 n.7 (7th Cir. 1977).

graph (k), as we read it, is to qualify the enforcement rights and authority granted by §§ 309 and 505 of the Act.

Other sections of the Act confirm the interpretation we place upon § 402(k). We begin with § 307 itself. Paragraph (a) of that section requires the Administrator to promulgate effluent standards for toxic pollutants, which are not to be limited to those injurious to human health. Subparagraph (6) of that paragraph requires that the effective date of a standard be no later than one year after the promulgation date. Under paragraph (d),

> [a]fter the effective date of any effluent standard or prohibition . . . under this section, it shall be unlawful for any owner or operator of any source to operate any source in violation of any such effluent standard or prohibition.

There is nothing in § 307 or elsewhere in the Act to indicate that Congress intended to excuse permit holders from full compliance with that section.

It is apparent from § 402 that Congress contemplated that permits would be issued as soon as possible. Relatively short periods of exemption from enforcement were provided for applicants under paragraph (k) as we have seen. Paragraph (a)(1) authorizes the Administrator to issue permits without waiting for "the taking of neces-

sary implementing actions" such as the formulation and adoption of toxic pollutant standards. Congress must have realized that many permits would be issued before some or all of the toxic standards could be made effective. An intention to excuse all permit holders who obtained their permits before a toxic standard became effective from compliance with that standard during the life of the permit seems highly unlikely, especially in view of the importance Congress attached to prompt compliance with toxic pollutant standards. Referring to § 307, the Senate Report states,

> The bill would provide that any standard or prohibition should become effective no later than one year after such promulgation. Because of the hazards posed by toxic substances, the committee considers the need for compliance with promulgated standards for toxic substances to be especially urgent. Language in section 307(a)(5) [section 307(a)(6) in P.L. 92–500] is thus intended to convey that one year be an absolute maximum time allowed for compliance with standards promulgated under this section, and that compliance be required as early as possible within this limit.

Legis.Hist. at 1479.[7]

When Congress wished to limit the Administrator's authority to modify permits, it

---

**7.** Moreover, § 307(a)(1) directs the Administrator, after publishing the list of toxic pollutants, to revise the list from time to time. The Clean Water Act of 1977, Public Law 95–217, § 53, amends § 307(a)(1) to adopt a list, which the Administrator may from time to time revise by adding or removing any pollutant. Although original § 307(a)(2), dealing with effluent standards for listed toxic pollutants, does not expressly provide for modification of a standard once it is issued, §§ 42 and 53 of the Clean Water Act provide that the discharge of toxic pollutants listed pursuant to § 307(a)(1) are to be regulated by effluent limitations established in accordance with §§ 301(b)(2) and 304(b)(2) of the Act, and expressly (§ 53, amending § 307(a)(3)) require periodic review and appropriate revisions at least every three years. Additionally, § 301(d) requires EPA to review at least every five years effluent limitations established under § 301(b)(2), and § 304 guidelines (on which § 301(b)(2) effluent limitations are to be based, see E. I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 131, 97 S.Ct. 965, 51

L.Ed.2d 204 (1977)) are to be revised at least annually, if appropriate, § 304(b).

EPA has issued effluent limitation guidelines and new source performance standards under §§ 301, 304, and 306 of the Act for 55 industries. In a consent order approved by the court in *Natural Resources Defense Council v. Train*, 8 E.R.C. 2120 (D.D.C.1976), the Administrator agreed to revise the 1983 limitations for 21 major industries assessing the impact of 65 especially deleterious pollutants that might be discharged by those industries. Promulgation of regulations for certain industries are scheduled for as late as December 1979. The significance of these developments to the case before us is only to illustrate the complexity and difficulty of developing comprehensive standards regulating discharges of pollutants, of which Congress must have been aware when it adopted the FWPCA.

There was some discussion in the briefs and at oral argument of the Administrator's power to reserve permit modification rights with re-

did so in explicit language. Under § 306, "standards of performance" (defined in § 306(a)(1) to mean only standards adopted under that section) for new point sources are to be revised from time to time, § 306(b)(1)(B), but a more stringent standard of performance may not be imposed on an individual source for ten years after completion of construction or until the facility is fully depreciated or amortized, whichever is earlier, § 306(d). It is inferable from Congress' special treatment of new sources that it determined to afford protection of a limited kind to new sources but not to extend the same protection to existing sources or to restrict the effectiveness of § 307 standards even upon new sources.

■ Inland also argues that § 402(b)(1)(C) should be read as limiting the Administrator's authority to modify permits. That provision, applicable in terms to states that assume NPDES permit issuing authority but applicable to the Administrator so long as he retains that authority in any state, § 402(a)(3), gives authority to issue permits that

can be terminated or modified for cause including, but not limited to, the following:
(i) violation of any condition of the permit;
(ii) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;
(iii) change any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

Contrary to Inland's contention, we do not read "for cause" as referring only to conduct of the permit holder, nor did the only other court that has so far addressed the question, *Peabody Coal Co. v. Pollution Control Board*, 36 Ill.App.3d 5, 22, 344 N.E.2d 279, 291–292 (5th Dist.1976). Listed cause (iii) in fact seems broad enough to cover the adoption of a more stringent toxic pollutant standard, and, in any event, does

not refer to conduct of the permit holder or circumstances within his control. More important, the list of causes in § 402(a)(3) is expressly stated not to be exhaustive.

Inland also relies upon language in a footnote at the end of the opinion of Mr. Justice Stevens for the Court in *E. I. duPont de Nemours & Co. v. Train, supra*, 430 U.S. at 138 n.28, 97 S.Ct. at 980, which reads as follows:

Petitioners attach some significance to the fact that compliance with a § 402 permit is "deemed compliance, for purposes of sections 309 [the federal enforcement section] and 505 [the citizen suit section], with sectio[n] . . . 306 . . . ." § 402(k). This provision plainly cannot allow deviations from § 306 standards in issuing the permit. For after standards of performance are promulgated, the permit can only be issued "upon condition that such discharge will meet . . . all applicable requirements under sectio[n] . . . 306 . . . ." § 402(a)(1); and one of the requirements of § 306 is that no new source may operate in violation of any standard of performance. § 306(e). The purpose of § 402(k) seems to be to insulate permit holders from changes in various regulations during the period of a permit and to relieve them of having to litigate in an enforcement action the question whether their permits are sufficiently strict. In short, § 402(k) serves the purpose of giving permits finality.

Upon the first casual reading, the last two sentences seem to support Inland's position. They must be read, however, with an eye on the contention to which the footnote was addressed. The petitioners had argued that Congress intended to permit variances from new source performance standards established under § 306, stating in their brief:

The statutory provisions pertaining to permits contemplate exceptions, by providing that permit proceedings may re-

---

spect to effluent limitations adopted pursuant to §§ 301 and 304. This question is not before us, inasmuch as neither the challenged modifi-

cation provision of Inland's permit nor the regulation on which that provision is based refers to § 301–§ 304 effluent limitations.

sult in limitations in a permit for a new source which are different from (either more or less stringent) and which override the new source standard. Section 402(k) does not leave this possibility to inference. . . . A "safety valve procedure" in the standards thus simply would recognize the effect of § 402(k) and would provide a specified means for establishing limitations in permits for new sources which are different from the new source standards themselves.

Brief for Petitioners in *E. I. duPont de Nemours & Co. v. Train*, No. 75–1473 and 75–1705 (July 16, 1976) page 8. (Footnote omitted.) In response to this argument, EPA asserted that the purpose of § 402(k) was "to insure that, once a point source has obtained a permit, subsequent changes in effluent limitations will not place the permit holder in violation of the Act." Brief for Respondent 9. In so arguing, the Administrator also said that "the purpose of Section 402(k) is to accord finality to permits and provide assurance to industry that obtaining a permit will fulfill most of its obligation under the Act." *Id.* at 22.

The issue in the case at bar was not presented in the *duPont* case. The language used by the Court in adopting EPA's argument is broad enough to afford some comfort to Inland here; but we believe that language should not be construed as expressing an opinion on an issue the Court did not have before it and neither party had mentioned. The language should be read to mean that a permit insulates the permit holder from any change in the regulation until the change is incorporated into the permit, and as a recognition that changes in the regulations, except for those prescribing standards for toxic pollutants injurious to human health, are not self-executing but must be placed in a permit before they can be enforced against a permit holder.

■ The notion that Congress intended to withhold from the Administrator the authority to include in a permit a provision authorizing modification of the permit to incorporate a subsequently adopted more stringent toxic pollutant standard is hard to square with the alternative that concededly is open to the Administrator. He could choose to issue permits of extremely short duration instead of the five-year maximum permitted by § 402(b)(1)(B), or the three years fixed for Inland's final permit,[8] and thus assure that any new or amended toxic pollutant standard would be complied with promptly. Having given the Administrator this power, Congress would have had no reason of which we can conceive for withholding the authority he claims in this case.

Finally, the Administrator is given a broad discretion to choose the means by which he will carry out his responsibilities. He is authorized by § 501(a) "to prescribe such regulations as are necessary to carry out his functions under this Act." He also has the responsibility under § 402(a)(1) for imposing as a condition to the issuance of a permit that the discharge meets "all applicable requirements under," *inter alia,* § 307. In addition, when a permit is issued before the promulgation of standards applicable to the subject plant's discharges, as was the permit here with respect to toxic pollutant standards that permit is to be subject, under § 402(a)(1), to "such conditions as the Administrator determines are necessary to carry out the provisions of this Act." These expansive grants of power, considered together with the principle that the Administrator's interpretation of the Act he is responsible for administering is entitled to great deference, *see, e. g., American Meat Institute v. EPA, supra,* 526 F.2d at 449–450, would weigh heavily in favor of his interpretation even if we were not convinced, as we are, that Inland's contrary interpretation is untenable.

■ Inland also argues that its right to equal protection rooted in the due process clause of the Fifth Amendment has been violated because the Administrator did not include similar modification provisions in

---

8. Although Inland's final permit was issued in 1976 for three years, the initial permit was issued in 1974.

the permits issued to two of its competitors. EPA points out that it has issued numerous permits to steel manufacturers and other dischargers in the area and Inland has only pointed to two, and further that Inland is incorrect as to one of these. Without some showing to the contrary, we are entitled to assume that the Administrator has complied in good faith with his regulations in issuing the thousands of NPDES discharge permits other than the two referred to by Inland. Moreover, in the absence of some showing of intentionally invidious and discriminatory enforcement of the regulations against Inland, *cf. Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *Bordenkircher v. Hayes*, —— U.S. ——, ——, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), its selective enforcement argument is without merit.

REVIEW DENIED.