**UNITED STATES of America, Plaintiff,**

v.

**AMOCO OIL COMPANY, Defendant.**

**No. 80–0801–CV–W–0.**

United States District Court,
W.D. Missouri, W.D.

Jan. 3, 1984.

Mark Zimmermann, Asst. U.S. Atty., Kansas City, Mo., for plaintiff.

Joseph J. Kelly, Jr., of Spencer, Fane, Britt & Browne, Kansas City, Mo., for defendant.

## ORDER ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

ROSS T. ROBERTS, District Judge.

The United States, on behalf of the Environmental Protection Agency ("EPA"), seeks an assessment of civil penalties against Amoco Oil Company ("Amoco"), pursuant to 33 U.S.C. § 1319(d), for alleged violations by Amoco of an NPDES (National Pollutant Discharge Elimination System) permit regulating the discharge of effluents into the Missouri River in Jackson County, Missouri. The matter comes before me on the parties' cross motions for summary judgment or partial summary judgment.

A brief factual resume will suffice for present purposes. On December 31, 1975, the Missouri Clean Water Commission, acting under authorization from the EPA to conduct an NPDES program, see 33 U.S.C. § 1342(b), and Chapter 204, R.S.Mo. 1969 (as amended), issued NPDES permit "MO–0004774," establishing certain effluent limits with respect to discharges from two outfalls (Outfall # 001 and Outfall # 003) at Amoco's Sugar Creek refinery, located adjacent to the Missouri River near Kansas City, Missouri. The permit required that measurement samples be taken at least once per week with regard to various categories of effluents, and further specified that monitoring reports be submitted by Amoco on a quarterly basis. As to Outfall # 001, both "interim" and "final" limitation amounts were established for each type of effluent, with Amoco being required to achieve compliance with the "final" limits by July 1, 1977. Those limitation amounts, both as to "interim" and "final" limits, were specified in terms of a "daily average" figure. As to Outfall # 003, which carried discharges from the refinery's

water treatment plant (where Missouri River water was clarified for use in the refinery's cooling system), the only limit allowed was in relation to "total suspended solids" ("TSS"). The permit was to expire on December 30, 1980, although technically it still remains in effect since no new permit has been issued.

The United States filed suit on September 3, 1980, alleging (now under an amended complaint) that during each month from January, 1976, through June, 1980, except for the months of February, March and May of 1980, Amoco violated one or more of the interim or final "daily average" effluent limits set by the permit for Outfall # 001, and in addition, from August, 1978, to September, 1982, discharged unauthorized types of effluent from Outfall # 003. Amoco has denied all such charges.

In its present motion for summary judgment, the United States contends that Amoco's own monitoring reports reflect discharges from Outfall # 001 in excess of permit limits for each month between and including January of 1976 and January of 1980, and for the months of April and June of 1980, as well as a continuous discharge of unauthorized effluents from Outfall # 003 between August 21, 1978 and June 1, 1982. On that basis the government suggests it is entitled to a partial summary judgment establishing the fact of Amoco's liability for civil penalties, leaving only the amount thereof in controversy. Amoco counters with the assertion that, as concerns Outfall # 001, there are disputed material facts with regard to the meaning of the term "daily average," and that with respect to Outfall # 003 the government has adduced no evidence of violations except for a four-day period between February 26 and March 1, 1979.

In connection with its own summary judgment motion, Amoco suggests that if, for purposes of argument, one should accept as correct the government's position that the term "daily average" actually means "monthly average" (or, more specifically, an "average of daily values for thir-

ty consecutive days"), it would be impossible to apply the penalty provisions of 33 U.S.C. § 1319(d) (which set the penalty limits at "$10,000 *per day* of such violation") (emphasis added) to the violations which would thus be shown. Proceeding with that theory, Amoco argues that the suggested inability to impose any monetary penalty, and the lack of any need for injunctive relief (Amoco has since terminated operations at the Sugar Creek facility), leaves the case effectively mooted with respect to Outfall # 001. As to Outfall # 003, Amoco suggests that with the exception of the four-day period between February 26 and March 1, 1979, there is no proof of a discharge of any unauthorized effluents.

Resolution of these matters may be facilitated by dealing with Amoco's summary judgment request before treating the government's; and accordingly I turn first to a disposition of Amoco's motion.

## I.

## AMOCO'S SUMMARY JUDGMENT MOTION

### A.

### OUTFALL # 001

A grasp of the government's position with respect to the term "daily average" is necessary to an understanding of Amoco's summary judgment argument concerning Outfall # 001. The government contends that the term—which is not, as such, defined either in the permit or in any applicable statute or regulation—actually was intended by the issuing authority and understood by Amoco to mean what the government refers to as a "monthly average"—an "[a]verage of daily values for thirty consecutive days." See 40 C.F.R. § 419.12, setting forth the above-quoted language, in what the parties apparently agree is the accepted definition of "monthly average" as *that* term is used in NPDES permits. According to the government, an application of such a "monthly average" limitation might be demonstrated by the

following example: if the "monthly" average figure for a particular effluent was set by the permit at 10, and if the effluent levels shown by once per week sampling during a given month were 9, 14, 8 and 12 (thus giving an average of 10.75), a violation would be shown to exist.

Amoco's argument in connection with all of this is that since the language of 33 U.S.C. § 1319(d) specifies that the assessment of a civil penalty shall "not exceed $10,000 *per day* of such violation" (emphasis added), a violation which is capable of being penalized must be one which can be related to a specific, given day; and that, before a penalty can be imposed for a given day, a violation must be shown to have occurred on *that* specific day. In essence, Amoco's position is that the civil penalty provisions of § 1319(d) cannot be applied unless the permit contains a "daily maximum" limit for the effluent in question.

■ Although there is a certain "first blush" attractiveness to defendant's argument in this regard, I believe a proper interpretation of § 1319(d) requires rejection of the argument. First, the use of the words "per day *of such violation*" (emphasis added) would appear to represent a clear congressional recognition—indeed, contemplation—of the fact that the *violation* itself ("such violation") will or may be something which is measured by more than a day's period of time. To hold otherwise would be to render senseless the choice and ordering of the words used. Second, I note that the full text of § 1319(d), as applicable here, begins with the statement that "[A]ny person who violates ... *any* permit condition or limitation ... in a permit issued under section 1342 of this title" (emphasis added), shall be subject to the civil penalty in question. The use of the words "any permit condition or limitation" is hardly consonant with the idea that only those limitations which are expressed in terms of a "daily maximum" are to be subject to the civil penalties allowed for in the statute. Nor would such a restriction seem consistent with the general broad discretion, see, *e.g.*, 33 U.S.C. §§ 1311, 1342;

*National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 166–67 (D.C.Cir.1982); *Inland Steel Co. v. Environmental Protection Agency*, 574 F.2d 367, 373 (7th Cir. 1978), granted to the Administrator of the Environmental Protection Agency in connection with implementing the Clean Water Act's far-reaching goals for elimination of water pollution. See 33 U.S.C. § 1251. I conclude, accordingly, that a "violation," as that term is used in § 1319(d), clearly may be something which is measured in more than a single day's period of time. That being so, I also conclude that where effluent limitations are set on some basis other than a daily limit—that is, for example, where they are set as a weekly maximum limit, or a weekly average limit, or a monthly maximum or monthly average limit, etc.—a "violation" necessarily encompasses *all* the days involved in the time period covered by the limitation. Thus, for example, where effluent limits are set on a "monthly average" basis, a "violation" of that limit would be a violation covering and including all of the 30 days of that monthly period, and a civil penalty "not to exceed $10,000" could be imposed for each of those 30 days. Obviously this does not mean that a penalty of $10,000 for each of the 30 days ($300,000) is *required* for such a violation; only that, where circumstances warrant, a penalty reaching (but not exceeding) that amount could be imposed.

■ Amoco cites *United States v. Detrex Chemical Indus.*, 393 F.Supp. 735 (N.D.Ohio 1975), as suggesting, to the contrary of the reasoning expressed above, that "Congress intended the focus of the Clean Water Act penalty to be the day of the violation and not the violation itself." I do not so read the case, at least in the broad sense urged by Amoco. The court in *Detrex* was concerned with whether, under the statutory language cited above, a penalty in excess of $10,000 per day could be imposed where more than one "violation" occurred on a given day. The court simply held "that Congress intended a maximum of $10,000 civil penalty per day regardless of the number of violations occurring on

that day." *Id.* at 737. Whether or not this represents a correct interpretation of the statute,[1] there is nothing in the ruling to suggest, as Amoco would have it, that the permit "violation unit" (the increment of time by which a "violation" is measured) (here, at least by the government's argument, a month of 30 days) must be the same as the statutory "penalty unit" (the increment of time by which the penalty is computed) (a "per day" basis) in order for a penalty to be capable of assessment. Where, as in the present case, the "violation unit" is measured by more than a single day's period of time, I can see no impediment at all to the assessment of a penalty related to the number of days involved in that "violation unit." To the contrary in fact, such a penalty would seem to be precisely that which is contemplated by the term, "per day of such violation."

1. I would view the ruling as correct if the situation facing the court in *Detrex* was one in which the multiple daily "violations" were violations of a limit for a single effluent; that is, for example, where the limit for a particular effluent was specified on an "hourly maximum" basis, and where monitoring showed violations for several different hours during the day. This is simply because it is conceptually difficult (if not impossible) to apply the words "per day of such violation" separately to each such violation. On the other hand, a good argument can be made for the idea that violations of the daily limit for two or more *different effluents* should be subjected to separate penalties. Under that theory, if a permit specified a daily maximum limit for grease, and a separate daily maximum limit for chromium, and both limits were violated on a particular day, a maximum penalty of $20,000 could be imposed. The question in that situation, as I see it, would involve the proper meaning to be accorded the term "such violation."

The opinion in *Detrex*, unfortunately, does not make entirely clear just which of the above situations was involved, although there are indications that it was the latter. If so, I would express my reservations on the point, for the reasons mentioned above. I need not and do not rule the matter at this juncture, however, since it is not directly involved in a disposition of the present motions.

2. As noted in *National Wildlife Federation v. Gorsuch*, 530 F.Supp. 1291,˙ 1309–10 (D.D.C. 1982), *rev'd* 693 F.2d 156 (D.C.Cir.1982), measurements for "total suspended solids," like measurements for BOD (biological oxygen de-

## B.

### OUTFALL # 003

Amoco's motion for summary judgment with respect to Outfall # 003 is predicated upon different grounds. A further brief factual resume is necessary.

Processing wastes from the refinery were collected in the refinery sewer system and discharged into a lagoon, which in turn discharged into the Missouri River through Outfall # 001, previously referred to. Outfall # 003, on the other hand, served the refinery's water treatment plant, and discharged water from the refinery's cooling system into the Missouri River. By virtue of the 1975 permit, no "pollutants," as defined in 33 U.S.C. § 1362(6), were to be discharged at Outfall # 003, although unlimited amounts of "total suspended solids" were permitted to be present in the water.[2]

mand) and pH, are not measurements of a "pollutant," as such, but rather are measurements designed to show certain water conditions, which may in turn reflect the presence of "pollutants" or of other things which, while not specifically designated as "pollutants" in § 1362(6), may adversely affect the quality of the water if present in sufficient amounts. In the case of "total suspended solids," the measurement is designed generally to reflect sediment load.

A permit limitation which allows for an "unlimited" amount of "total suspended solids" may seem anomalous. When viewed as a part of the Clean Water Act's permit scheme, however, such is not necessarily the case. In the present instance at least, the idea seems to have been to permit Amoco to discharge back into the river those sediments which it precipitated out of the water it drew from the river for cooling purposes, while preventing it from discharging any of the "pollutants" identified in 33 U.S.C. § 1362(6). The latter result occurs because of the Act's requirement that *no* pollutant be discharged unless a permit therefor is obtained. See *United States v. Frezzo Bros., Inc.*, 546 F.Supp. 713, 716–19 (E.D.Pa.1982). Since a limitation (or, as it were, an "unlimited" limitation) for "total suspended solids" is a separate parameter, which does not itself create an authorization to discharge any specific "pollutants" listed in § 1362(6), even if the same are in a "suspended solid" form, the result is to permit an unlimited sediment load, so long as there is no discharge, either as a suspended solid or otherwise, of any of the specific "pollutants" listed in § 1362(6).

At the time the 1975 permit was granted, the cooling system water was drawn directly from the Missouri River, treated to remove hardness in the water, and eventually discharged back into the River through Outfall # 003, together with the sediment which was precipitated out when the water was treated. Apparently there was no mixing of water used in the refinery processing system (discharged through Outfall # 001) and water used in the cooling system (discharged through Outfall # 003). In 1978, however, Amoco began using refinery processing water (which would otherwise have been discharged through Outfall # 001) to supplement the water used in its cooling system, discharging the resulting mix of water, after use in the cooling system, through Outfall # 003. No new permit or permit modification was applied for.

█ The government's position on this aspect of the matter is not entirely clear. At oral argument the government's theory seemed to be, at least in part, that the "violation" with respect to Outfall # 003 is to be found in Amoco's failure to apply for a new or modified permit when it "changed its process" by diverting refinery processing water into the cooling system, regardless what the resulting makeup of discharge water from Outfall # 003 might have been. At other points in that argument, however, and in both its written suggestions and in its complaint, the government's assertion is that the claimed violation with respect to Outfall # 003 exists in the fact that "effluent from Outfall # 001, which contained phenols, oil and grease, ammonia, chromium, sulfides and other process pollutants," was discharged at Outfall # 003, in violation of the permit. Amoco's motion relates only to the latter theory.

While there might be merit in the government's suggestion that Amoco's failure to apply for a new or modified permit when it began mixing refinery process water with cooling water was, in itself, a permit violation, I feel obliged to reject it as any theory which the government is entitled to pursue at this point in the litigation, and by the same token any theory which Amoco is obliged to defend against. After the filing of two amended complaints—the last *after* the government had argued the present summary judgment motions—there is still nothing in the complaint which, even under liberal federal pleading rules, can fairly be construed as an assertion of this as a basis for liability, either generally or with respect to Outfall # 003 specifically. I conclude, accordingly, that the claim at issue with respect to Outfall # 003 will require proof of the actual discharge, through that outfall, of one or more of the "pollutants" described in 33 U.S.C. § 1362(6).

Briefly stated, Amoco's argument on that subject is that there are no monitoring reports for Outfall # 003 which establish the presence, there, of any such pollutants, except for the period of time extending from February 26, 1979, to March 1, 1979. The government's response, aside from its apparent alternative theory mentioned above, is that if monitoring at Outfall # 003 between February 26, 1979, and March 1, 1979 (after Amoco began to use refinery process water as a part of the water used in the cooling system), showed the presence of pollutants limited for Outfall # 001, the court may infer, circumstantially, that a discharge of *some* amount of those other pollutants occurred at Outfall # 003 throughout the entire time Amoco followed its practice of mixing refinery process water with ordinary cooling water (from August 21, 1978, to June 1, 1982, when the refinery closed entirely; a total of 1,379 days).

Although the government's position with respect to all these matters may leave something to be desired for present purposes, I conclude that Amoco's summary judgment motion with respect to Outfall # 003 must be denied. It is clear that, as the party opposing a summary judgment motion, the government is entitled to the benefit of all inferences favorable to its position which might be drawn from the record. *Wermager v. Cormorant Tp. Bd.,*

716 F.2d 1211, 1214 (8th Cir.1983); *St. Louis County Bank v. U.S.*, 674 F.2d 1207, 1209 (8th Cir.1982); *Sommers v. Budget Marketing, Inc.*, 667 F.2d 748, 749–50 (8th Cir.1982). As the government suggests, there is at least an inference in its favor which the court might draw with respect to a continuing discharge of pollutants at Outfall # 003. The government is entitled to the benefit of that inference for purposes of the present motion, cases *supra*, no matter how the sufficiency of the inference might be viewed in connection with the government's ultimate burden of proof at trial.

## II.

### THE GOVERNMENT'S SUMMARY JUDGMENT MOTION

### A.

### OUTFALL # 001

■ If the term "daily average," as used in the permit with respect to Outfall # 001, is in fact properly interpreted to mean an "average of daily values for 30 consecutive days," then it is clear, according to the government, that Amoco's own discharge monitoring reports establish a violation with respect to Outfall # 001 for each month beginning with the month of January, 1976, and extending through the month of January, 1980, as well as for the months of April and June of 1980. See Exhibit K, attached to the government's motion for summary judgment, and Exhibit F to the parties' Stipulation of Facts. Amoco does not dispute the latter premise, but does argue that the term "daily average" is ambiguous, and that a legitimate dispute exists over the appropriate meaning to be given the term here.

Amoco correctly notes that the term "daily average," as such, is nowhere defined in the permit, or in any applicable statute, or in any governing regulation. Indeed, that term does not even appear in any relevant statute or regulation (nor, for that matter, does the government's suggested synonym, "monthly average").

And in fact the term "daily average," standing alone, might well be considered inherently ambiguous, since one can, with fair logic, argue either that it refers to the average of several samples taken on one given day, or alternatively to the average of one or more samples, per day, taken on several different days. Furthermore, if the latter definition is adopted it becomes important to know the number of days which are to be averaged—*e.g.*, a week, a month, or a quarter—since the inclusion of more days or fewer days can obviously have a direct bearing upon whether the resulting "average" exceeds the numerical effluent limit specified in the permit. Thus a judicial interpretation of the term is necessary; and the immediate question, in turn, becomes whether it can be said from the materials now before the court that there is in actuality no genuine issue of material fact with respect to that interpretation.

The government presents a strong argument that its equation of the term "daily average" with the phrase "average of daily values for 30 consecutive days" represents the meaning of the term as understood by all parties. Thus, among other things, the government points out that the numerical effluent limits specified in the permit, under the heading of "daily average," correspond closely to the numerical effluent limits Amoco itself proposed in its 1974 request for that permit, under the heading "monthly average," and that both figures are considerably different from the "daily maximum" limits proposed in Amoco's request. Further, in an internal memorandum authored by John Huddle, the Refinery Process Coordinator at Amoco's Chicago headquarters and one of the Amoco personnel involved in negotiating the 1975 permit with the Missouri Clean Water Commission, the proposed interim and final effluent limits for the 1975 permit are described as "monthly average" limits, and correspond, with the exception of a slight difference concerning the interim limit for "total suspended solids," exactly to the interim and final limits actually established in the 1975 permit under the heading of

"daily average." In addition, a 1980 internal memorandum authored by R.W. Ginson, Amoco's Environmental Control Coordinator at the Sugar Creek refinery at that time, sets forth Mr. Ginson's definition of the term "daily average" (incorrectly attributed to Missouri Clean Water Commission regulations, but nevertheless pertinent here as bearing on Amoco's understanding of the term) as being "the average of all daily concentrations made during a calendar month." Furthermore, I note that Amoco's own discharge monitoring reports, as submitted for the period in question, undertake to compute an average, on a monthly basis, for the once-per-week samples required by the 1975 permit. This is somewhat difficult to explain unless there was understood to be some significance in a monthly average.

On the other hand, the permit requires Amoco to submit its monitoring reports on a *quarterly* basis, and the report forms actually utilized contain a place for statement of the *quarterly* average. In fact, the only space on the form which bears a printed legend indicating that an "average" figure is to be supplied is the space for the quarterly average. All this, obviously, is rather suggestive of the idea that it is the average of all tests over a calendar quarter, rather than over a month, which is to be the critical figure. And in fact at least two of Amoco's representatives (Lampkin and Wurtz) have testified that they understood, or thought, the term "daily average" actually meant "quarterly" average. Thus "quarterly average"—the average of all samples taken over a consecutive three-month period—emerges as at least an arguable alternative meaning for the term "daily average."

From the evidence available the concepts of "quarterly" average and "monthly" average, as defined above, would appear to be the only viable candidates for the correct meaning of "daily average" as that term is used in the permit. And in fact the dispute over which of those terms is appropriate may be academic to some degree, since a violation of a particular effluent limit for each of the three months of a calendar quarter would obviously represent a violation for the quarter itself, and either would represent 90 to 92 days (depending on which months were involved) of "such violation." Nonetheless, in those instances where violation of a particular effluent limit occurs for less than all three months of a quarter, the difference between "monthly" and "quarterly" averaging is potentially significant, since a quarterly average figure within the numerical limit specified in the permit would mean there was no violation for *any* of the months (or days) of that quarter, even though one (or conceivably even two) of the monthly averages exceeded that numerical limit. And of course the converse is true as well.

As noted previously, the term "daily average" is, in the abstract, probably inherently ambiguous. And even when the other evidence now before the court—including extrinsic evidence—is brought to bear, there remains at least some legitimate basis for argument over the correct meaning of the term as used in the permit. In fact the situation here is rather like that encountered in connection with questions of interpretation in contract cases. There, it is said, summary judgment will often (if not usually) be inappropriate, since the judicial determination of a term's meaning will often involve the drawing of factual inferences as to which reasonable men might differ. See generally 10A *Wright, Miller and Kane, Federal Practice and Procedure* § 2730.1, pp. 265–66 (2d Ed.1983), and cases cited therein at note 1. That, as I view it, is the situation here; and while the government might be thought to have the better part of the argument upon the present record, I am forced to conclude that its motion for summary judgment with respect to Outfall # 001 must be denied, even as to the issue of liability alone.

Technically, I need go no further for present purposes. Amoco, however, has advanced several other defenses with regard to its potential liability for discharges at Outfall # 001; and since, for the reasons which follow, I view those suggested defenses as legally insufficient under any

view of the facts, it is perhaps best to dispose of them here.

First, Amoco asserts—or at least did so at oral argument on the present motions— that a defense remains at issue in connection with the fact that no action was taken by the government with respect to violations at Outfall # 001 until this suit was filed on September 3, 1980, over four and one-half years after the first of the alleged violations there occurred, with that first alleged violation and all those subsequent thereto being well known to the government by virtue of the discharge monitoring reports which Amoco itself timely submitted. Amoco refers to this as representing an "equitable defense," presumably in the nature of estoppel, waiver or laches.

■ Without pardoning the EPA's apparent abysmal failure to protect the public interest, I must reject defendant's suggestion as a matter of law. It is clear that the defense of laches does not apply to the United States when it acts in its sovereign capacity, as of course it does here. *United States v. One 1978 Buick Riviera Auto.*, 560 F.2d 897, 899 (8th Cir.1977). Neither can there be any estoppel against the United States, in the absence of some *affirmative misconduct* on the part of the government. *Akbarin v. Immigration and Naturalization Service*, 669 F.2d 839, 842 (1st Cir.1982); *United States v. Harvey*, 661 F.2d 767, 773–75 (9th Cir.1981); *Yang v. Immigration and Naturalization Service*, 574 F.2d 171, 175 (3d Cir.1978). Here the problem is one of inaction, rather than affirmative acts of misconduct. Nor in my judgment can any defense of waiver be asserted against the government in this kind of situation, since generally speaking public officers have no power or authority to waive the enforcement of the law on behalf of the public. See 28 *Am.Jur.2d*, Estoppel and Waiver 838 (1966); 31 *C.J.S.*, Estoppel 686–87 (1964). The EPA's failure to take action more promptly may arguably have some bearing on the amount of any penalty to be imposed, but that failure cannot function as a defense to the imposition of any penalty at all.

■ Amoco further suggests that questions relating to its good faith remain at issue. That argument, too, must be rejected as a matter of law, insofar as the general issue of liability is concerned. The liability imposed under § 1319(d) is a variety of strict liability, and neither fault nor intent are relevant thereto, except in connection with the amount of penalty imposed. *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir.1979); *U.S. v. Bradshaw*, 541 F.Supp. 884, 886 (D.Md. 1982). By the same token, Amoco's good faith, even if assumèd for present purposes, could not serve as a defense on the general question of liability, although, again, it may have a very direct bearing upon the amount of any penalty imposed. Compare *U.S. v. Texas Pipe Line Co.*, 611 F.2d 345, 347 (10th Cir.1979).

■ As a final matter, at least as suggested at oral argument on the present motions, Amoco urges that the failure of the permit to specify "daily maximum" limitations in addition to those for "monthly averages," as apparently required by EPA regulations then in effect, renders the entire permit unenforceable. Although I have no idea why, in those circumstances, the EPA approved a permit which did not include a "daily maximum" limit, the point must be rejected. If the permit was in fact invalid, as suggested, then Amoco was either left to meet the requirements of its prior (1973) permit, which were even more stringent, or was operating without any permit at all. In the latter event, a discharge of *any* amount of the various pollutants in question here would constitute a violation of the law, capable of being penalized under § 1319(d). See 33 U.S.C. §§ 1311(a), 1319(d); *United States v. Frezzo Bros., Inc.*, 546 F.Supp. 713, 716–19 (E.D.Pa.1982). Given all this, and the lack of any prejudice to Amoco (since the presence of a "daily maximum" limit would not function to prevent assessment of a penalty for violation of a "monthly average" limit in the same permit, even where the "month" in question included one or more days on which "daily maximum" limits

were not exceeded),[3] I conclude that Amoco's position on the subject is without merit. In the circumstances shown here, the omission of one limit from the permit—even a required one—cannot serve to prevent enforcement of another required limit which *is* set forth in the permit.

## B.

### OUTFALL # 003

The government's position with respect to Outfall # 003 is quite simple. As will be recalled, the only permit limitation announced for that Outfall was with respect to "TSS" (total suspended solids). By the same token, however, since there were no limits established for pollutants—and in particular those pollutants for which a limitation was established at Outfall # 001—a discharge at Outfall # 003 of any pollutant, in any amount, would represent a violation of the permit.[4]

The unrebutted evidence before me establishes that an unannounced compliance inspection of Outfalls # 001 and # 003 was conducted by the Enforcement Division of the EPA during the week beginning February 25, 1979. According to the EPA report of the matter, the inspection "consisted of three days' composite sample collection at the two outfalls and water intake including ICP scan on the discharges daily." The result of the testing on those three days (February 27, 28 and March 1)—which is unchallenged by Amoco—established the presence of at least five unauthorized pollutants (sulfide, phenols, oil and grease, chromium and hexavalent chromium) on

each day. See Exhibit I, attached to the government's motion for summary judgment.

■ This clearly shows a violation of the permit with respect to Outfall # 003 for each of the three days in question. The government urges, however, that this same evidence will support a partial summary judgment on the issue of liability for each day of the entire period of time between August 21, 1978, and June 1, 1982. The government's argument is premised upon the theory that the subject pollutants were present at Outfall # 003 because of the mixing of refinery processing water and cooling water (adverted to previously), and that the court can and should infer that such pollutants were discharged at Outfall # 003 on each day that such mixing process was utilized—that period being from August 21, 1978, until closure of the entire facility on June 1, 1982.

Amoco does not appear to contest the fact that the source of the unauthorized pollutants was the mixing of refinery processing water and cooling water, and I can accept that matter as established for present purposes. Beyond that, however, I cannot go, at least for summary judgment purposes. While I may indeed draw an inference of the sort the government suggests, and in doing so preserve the government against Amoco's own summary judgment motion, I am by no means certain enough of the ultimate strength of that inference to grant the government a summary judgment in the matter. In short, although the present state of the record

---

**3.** It is said to be commonplace—if not required—for a permit to specify effluent limitations in both a "daily maximum" amount and a "monthly average" amount. The limits for "daily maximum" amounts are considerably higher than those for a "monthly average." This is done in order that both short term (daily) and longer term (monthly) discharge practices can be controlled, while taking into account the fact that the permit holder will ordinarily experience some variation, over several days, in the discharge patterns which occur. Each limit thus has a purpose, and while one might initially question the idea that a violation of the

monthly average limit should lead to the imposition of a penalty for each of the days of that month, including those on which no violation of the daily maximum occurred, there is, in reality, nothing inappropriate in that result. Water quality can be as much—if not more—affected by excess long term discharges as by excess short term discharges, and a penalty imposed for the entire period of a long term excess can hardly be considered illogical.

**4.** See footnote 2, *supra.*

may be enough to save the government from a summary judgment on the issue, it is hardly sufficient to compel a summary judgment in the government's favor.

Although it would be permissible to grant the government a partial summary judgment on the issue of liability with respect to the days of February 27, 1979, February 28, 1979, and March 1, 1979, I doubt that any benefit would accrue from fragmenting the claim in that fashion. Following such a course would neither appreciably shorten the evidence to be presented with respect to the subject of violations at Outfall # 003, nor simplify the issues in any material respect. And in fact the government has not requested summary judgment on so limited a basis. In the circumstances, the simpler course is to deny the government's motion with respect to Outfall # 003, noting at the same time that at least some violations for that Outfall appear to be clearly shown.

### III.

### ORDERS

For the foregoing reasons, it is herewith

ORDERED that defendant's motion for summary judgment in the above-styled matter should be and is hereby denied; and it is further

ORDERED that plaintiff's motion for partial summary judgment on the issue of liability in the above-styled matter should be and is hereby denied.